After advisement, the following opinions were delivered:
By the President of the Senate.
The rights and duties of the parties in this case arise under several acts of the legislature. The privileges and immunities granted in these acts constitute the franchise, which- is the subject of this proceeding. These acts also prescribe the conditions upon which it was granted and is held. It will be at once perceived that this case involves many points important as well to the parties interested as to, *551 the people of this state, who, through their representatives in the legislature, *originally granted the franchise, and fixed its condi- [ *551 ] tions.
In examining these several points, it is material in the first place, to inquire what were the objects contemplated in the granting and accepting of this franchise ? These, so far as the people on the one part were Concerned, were two : 1. To procure for the public a new and better mode of passing the Harlaem river at the point proposed. 2. In providing for the public this new accommodation, to do it in such manner as to continue to the public, not materially impaired, the free navigation of that arm of the sea; and so far as the grantee of the franchise' on the other part was concerned, its beneficial object was the right, on complying with the conditions of the grant, to exact and take the toll therein prescribed during the term of sixty years. This beneficial object is rightfully made dependent upon the continued accomplishment of the other two. To assure the accomplishment of these two objects, it was essential that the structure to be erected should not only be originally built in the manner and according to the dimensions prescribed in the grant, but that it should also continue to be so upheld during the term of the grant. The former was not more necessary to the first vesting of the grantee’s title, than the latter to its continued existence. Both were equally indispensable. The dimensions of the bridge prescribed in the grant are to be taken as the settled judgment and agreement of both parties as to what was necessary to the attainment of the two first objects of the grant. These, therefore, are to be strictly observed as conditions equally indispensable to the commencement and to the continuance of the title to the franchise.
The doctrine which has been advanced, that an observance of the requirements of the grant is only essential as a condition precedent to the vesting of the grantee’s title, and not equally essential as a condition of its continuance, would seem to be not only subversive of the two great objects of the grant, so far as the people are concerned, but would also undoubtedly be a violation of the intention of both parties. It would, indeed, be the height of absurdity to suppose, *that in prescribing the di- [ *552 ] mensions of the structure to be erected over this navigable water, the parties intended merely to fix a condition of the original construction, which was not equally obligatory in the future maintenance of the work. If those prescribed dimensions of the structure were essential to the free navigation of the stream at the time of its completion, would they not be equally so at every subsequent moment of the term of the grant ? and is it to be supposed that the vigilant guardians of the people’s interests would take care to secure the former, and not equally provide for the latter ? That they would fix a condition to the vesting of the title to the franchise, which was not equally indispensable to its continuance ? A failure in the latter, no *552 less than the former, would defeat the great public objects of the grant. Both, therefore, are equally important, and equally binding.
In the second of those objects, too, the grantee of the franchise is no less interested than the people themselves; for the legality and of course the validity of the - grant depends upon this. The right of an individual state to build; or authorize the building of a bridge across a navigable water of the United States, although within the territory of such state, can only be exercised in such manner as not materially to interrupt the free navigation of such water j or seriously conflict with the constitution and laws of the United States regulating such navigation. The adjudicated cases concede to the individual states the right to erect or authorize to be erected bridges across arms of the sea, within their respective territories, where the tide ebbs and flows,.and which are navigable by licensed coasting vessels ; provided such bridges he built with a draw for passing and repassing vessels free of expense, and without material interruption. The object of such a power in the several states is not inconsistent, but in strict harmony with that of the constitutional power of congress “to regulate commerce.” Both have in view the public accommodation and the public interests. If these acquire such a facility for passing the navigable water ; if they would be more promoted by the erection of such a structure than com- [ *558 ] merce *would suffer by the immaterial interruption, then the power may be exercised by the several states within their respective territories;' and bridges over navigable waters are thus within state powers, and placed under state control, in the same manner as ferries, for which they are only better substitutes. The validity of this power, however, in the several states, whether in the original construction or subsequent upholding and regulation of bridges, depends always upon its being so exercised as not to conflict with the constitution and laws of the United States, and occasion no serious impediment or material interruption to navigation and commerce. If wisely exercised, without adding materially to the embarrassments of the former, it may greatly increase the facilities of the latter. This doctrine is fully laid down in Corfield v. Coyell, 4 Wash. C. C. R. 371, in Gibbons v. Ogden, 9 Wheaton, 1, and in The People v. The Rensselaer and Saratoga R. R. Co. 15 Wendell, 113, and particularly in the latter case, where Ch. J. Savage very fully and ably examines the whole subject, as Judges Washington, Marshall and Johnson had done in the other cases.
The great importance, therefore, even to the grantee as well as the public, of the second object of the grant will be readily seen ; and it was especially incumbent on the legislature, in making the grant, to provide for and assure its attainment. This was due not only to the interests of their own constituents, for which they were particularly bound to provide; but to the legal and constitutional rights of citizens of other states, which were beyond *553 their power or control, but,which they were bound to respect. The principle of “ sic utere tuo ut alienum non lcedas” was particularly applicable and binding upon them. This second object, therefore, was essential to the very vitality of the grant.
But upon broad and general principles, universally applicable in all cases of a grant of a public franchise upon conditions, it is not more essential to the interests of the people, than it is sound in principle, that the grantee of such franchise should be held to a strict performance of the con- ' ditions *upon which the grant is made. If a departure from these [ *554 ] conditions be permitted, there is no longer any fixed standard of right between the parties, and every thing is involved in doubt and uncertainty. ' The evil of this may readily be imagined, and clearly shows that a strict adherence to express conditions is the only true rule. There would be no safety under any other. It is this rule that we are either to affirm or repudiate in the present case. The importance of our decision then, in this case, can only be measured by the magnitude of the public interests involved in the almost countless grants of franchises on condition already in existence, or which may be hereafter called into being, by the future legislation of the state.
This general principle is also fortified by reasons to be drawn from the nature of these grafts. A franchise is a privilege or immunity of a public nature which can only be legally exercised by legislative grant. It is, of course in its nature exclusive, or a monopoly. These grants, therefore, should not be favored. ■ They should only be made in order to accomplish some important object of public good, not otherwise so well or so fully attainable. The public good, and not the private interest of the grantee, should in all cases be at once the principal inducement to, and the main object of the grant. If it be the reverse, then legislation descends from its elevated and appropriate. sphere, and these grants cease to be acts of public policy, and become matters of private favoritism.
If these views be correct, then these grants of public franchises are not mere gratuities, but contracts upon conditions. A performance of the conditions is the consideration of the contract, and constitutes its very essence and vitality. In the case before the court, it has been shown that this performance was also indispensable to the legality, and of course validity of the grant. It was also essential to the commencement and continuance of the grantee’s title to the franchise. It was not more necessary to the rights of the grantee to demand and receive the prescribed toll for the use of the bridge, the first moment of its completion in conformity with the grant, than it was to the continuance of *such right at a subse- [ *555 ] quent moment during the whole term for which the franchise was granted. Whether, therefore, this performance of the conditions of the grant be called “ a continuing condition precedent,” or “ a limitation and *555 condition of conformity to the requirements of the law,” is not material. By whatever technical name it may be called, it commenced and ran along, pari passu, with the franchise. The beneficial right of the grantee began and ended with it. As a performance of these ’ conditions vested the franchise, so a non-performance of them forfeited it.
The fact of this performance was put at issue by the pleadings, and was found against the defendant below, in not merely a material, but, as we have already seen, the most material condition of the grant: a condition which concerned the character of the legislature, the legality of its acts, the rights of citizens of other states, and the interests of our own. It is a rule of law, in eases like the present, that if only one material issue be found against the defendants, the franchise is forfeited and the people are entitled to judgment of ouster. See 4 Burr. 2143. and 7 Com. Dig. 200, tit. Quo Warranto, (c. 5,) Judgment, where it was said, that “ if one material issue be found for the crown, the crown must have judgment.”
But it is insisted on the part of the defendants below, that this issue was an immaterial one ; that as the verdict does not find any specific diminution in the statutory dimensions of the centre arch of the bridge, it might have been the smallest conceivable, and therefore immaterial; that “ the verdict is so vague and uncertain as to every thing touching a forfeiture of the franchise, that no definite conclusion of law can be deduced frbm it;” that “it is wholly insufficient to warrant or authorize a judgment of forfeiture.” We have already seen that this issue was upon the performance of one of the most material conditions of the franchise. The sovereign power that made the grant of the franchise also fixed this condition, as it had a perfect right to do. In doing this, we are bound to suppose that it was influenced by no idle capvice, but by an enlightened judgment of what was mate- [ *556 ] rial to the protection and preservation of all interests *concerned in the grant. It alone possessed at once the power to make the grant, and full discretion in its exercise. Where then is the power, short of that which fixed the condition, that can cither modify its form, or dispenso with its performance ? Who, under the adage oft invoked by delinquents, “ de minimis non curat lex,” will say the precise opening of twenty-five feet between the centre arches of the bridge, prescribed by the legislature, is immaterial; that twenty-four feet, or even some smaller-dimensions, will do as well ? that a substantial performance of this condition will satisfy every requirement of law or equity ? Will this court undertake to say so ? Has it any such dispensing power ? When the legislature, which alone could make the grant, and had the exclusive right to judge of and fix its conditions, has said that that opening shall be twenty-five feet, can this court say that any thing less than the prescribed dimensions will satisfy- the- requirements of the giant, or save the grantee from the consequences of a non-per*, forinance of its indispensable conditions ?
*556 Besides if the diminution in the opening between the centre arches of the bridge were in fact, as is pretended, inconsiderable or trifling; or if that diminution, whatever it might have been, had been occasioned by accident, by the act of God, or of third persons, or even by the neglect of the defendants and had been repaired, this might have been pleaded by way of avoidance or excuse. But the defendants tendered an issue generally upon the performance of the condition in which the attorney general joined, and the issue was found against them. The verdict was as general and as broad as the issue. It was in the language both of the issue and of the grant.
Even if this issue, in point of form, were premature or misjoined, that being matter of form is cured by verdict. In the case in error of The Bank of Utica v. Smedes, 3 Cowen, 682, it was well remarked by Chancellor Sanford, that “ the established rules of our law authorize, and justice and public convenience require, that the power of a verdict to cure formal defects in pleading, should be liberally applied.” The defendants too in the caso now before the court, *having acquiesced in the [ *557 ] conduct of the judge on the trial of the issue, the presumption must be that he did his duty: that, both in his admission of testimony and in his charge to the jury, he gave the defendants the full benefit of any evidence offered, that would go to show either that the diminution was immaterial, or, if material, that it was legally excused. The verdict upon this issue, therefore, is not only general, but stands unimpeached. It would seem, therefore, to be fully sufficient to sustain the judgment of ouster pronounced by the court below.
That the franchise in question in this case, is a public franchise, cannot, I think, admit of a doubt: for whether we regard its subject dr its source; the public interests it affects, or the public convenience it had in view, all concur in fixing its character as that of a public franchise.
As little doubt, I think, can be entertained that, under our statutes, and the interpretation already given to them by our own courts, the remedy sought in this case is the legal and appropriate remedy. Our statute of 1788 was substantially a re-enactment of the statute of Anne. The revised statutes are much broader upon this subject and clearly embrace the present case. This remedy is there made equally proper, in the case of any person originally usurping a franchise, the title to which was originally good, but the holding and exercising of which had become unlawful by means of the non-performance of the conditions, upon which the franchise was granted and upon which its title originally vested. That is the case now before the court; and is clearly embraced within the provisions of the revised statutes.
It is believed that this remedy is also good at common law. See 7 Comyn's Digest, p. 190 ; tit. Quo Warranto, (A) and the cases there cited,, particularly The King v. John Leigh, Mayor of Yarmouth, decided in 1768 in the king’s bench, by Lord Mansfield, Justice Yates and others, and reported iq 4 Burr. 2143,
*558 On the argument of the present case, it was insisted on the [ *558 ] part of.of the plaintiffs in error, that the statute of 1795 ‘virtually dispensed with the conditions of that of 1790, making the original grant of the franchise in question. It cannot be readily perceived how an act of the main provisions of which the grantees of the franchise had never availed themselves, and which with the exception of provisions reducing the width of the bridge from thirty to not less than twenty-four feet, and. requiring the grantees to give security for its completion and future maintenance, can possibly have the effect of either dispensing with or modifying the other conditions upon which the franchise was originally granted. Those conditions remain unchanged and in full force.
Equally difficult is it to perceive how the provision of the act of 1795, requiring the grantees' of the franchise to give security for the completion and maintenance of the bridge, can either modify the original conditions of the grant, or take from the people the common law remedy for a non-performance of those conditions. Instead either of taking away or being a substitute for that remedy, it was but cumulative, and therefore added to it. Instead, therefore, of either modifying or dispensing with the original conditions’of the grant, it did but add to them new force, by giving a new remedy for their non-performance.
But- it is said that the penalty of forfeiture is a severe one; and that the law abhors a forfeiture ; that there are other milder remedies, which should have been invoked on this occasion; such as mandamus, prohibition, injunction, civil suits, indictment, and, in this case, the cumulative remedy of 'pecuniary penalty. It has already been well answered by the counsel for the people that it is a principle of policy in public grants, that the law should be preventive, rather than remedial. That it intends rather to prevent wrongs, than to provide remedies for such wrongs. This great and salutary principle of preventive remedies requires a strict observance of the conditions of public grants; and an equally strict enforcement of the penalty for their non-performance, even although that penalty be a forfeiture of the franchise granted. If the law abhors a forfeiture, it abhors still more the continued enjoyment of valuable franchises in defiance of the requirements [ *559 ] of the laws creating them, or a *non performance of the condi. tion originally granted.
This case, also, under the judgment of the supreme court, is presented to us as one of great hardship for the plaintiffs in error, and our sympathies have been strongly appealed to in their behalf. I am not unaware how important to the individuals interested therein may be the loss of a valuable franchise, which they have long enjoyed, even though that loss may have been occasioned by their own fault; and if it were as easy to do justice as to indulge sympathy, our labors here would become matters of personal sentiment, instead of hard and unyielding duty, I fully admit that grants of *559 public franchises should ever remain inviolable, so long as their conditions are faithfully performed, and they continue to accomplish the public objects for which they were made. The public, faith in its public grants, as in every thing else, should ever be preserved. Nor am I insensible to the obligation of protecting private property in such grants; but the public good is always of paramount consideration and regard. The private loss, however great, in an individual case, has but a feather’s weight, compared with the magnitude of the public evil which would flow from a precedent that should establish the principle that grantees of-public franchises upon conditions, may neglect to perform those conditions, and yet continue to enjoy the franchises. Under such a precedent, it is not difficult to foresee that the public benefits of such grants of valuable franchises would be utterly lost to the people; benefits which constituted at once the motive and main object of the grants, and which alone could render the grants themselves either expedient or proper. For it should be recollected that such grants are the conferring on individuals rights belonging to the whole people, and can only bo justified by securing to the people, in the grants themselves, benefits equivalent to the rights which the grants take from them. This can only be done by enforcing a strict performance of all the beneficial conditions of such grants. In the recognition and enforcement of this great principle, the plaintiffs in error, themselves, as citizens of the state with others, are 'deeply interested ; much more so, indeed, [ *560 ] than they can be in the preservation of the franchise in question. , But even if it were otherwise, the paramount interests 'of the public must, in all cases, prevail.
It has been also said that the severe judgment of the supreme court, if sanctioned here, would shake the foundations of public faith, and put in jeopardy every franchise in the state. Again, it has been well replied that “ salutary correction of the Wrong, only strengthens the right.” If such correction be withheld — if the principle of strict performance be relaxed, and the grantees of valuable franchises be permitted to enjoy their benefits, without, by a performance of their conditions, conferring their corresponding and originally contemplated benefits' upon the public — it requires no seer to forewarn us that a spirit of jealousy in regard to such franchises would soon be engendered among the people. That this spirit would soon ripen into one of decided and active hostility, that would not merely put those valuable franchises in jeopardy, but would soon sweep them all from existence. But, on the contrary, if, where wrong exists, just and salutary correction be promptly and faithfully applied, and in all eases a strict performance of the beneficial conditions of such franchises be observed or enforced, the public, as well as the grantees of the franchises, will feel their benefits, and be reconciled to their creation and continued existence. The principle of strict performance of conditions in these cases, therefore, instead *560 of being a destructive, is in fiel tho only benign arul conservative principle. Under its influence alone can the rights of both tho grantors and grantees of public franchises be preserved.
In conformity with these views, I shall vote for affirming the judgment of tho court below.
By Senator Edwards.
As I construe the act of 1795, the owners of tho bridge were nob authorized to reduce the opening between the centre arches to a width less than twenty five feet. The object of this act was to amend the act of 1790, so as to enable Coles to build the dam [ *561 ] which it *describes, and to modify the act in such particulars as it . enumerates : such as to reduce the width of the bridge, and to require it to be built within a certain period, &c.; but the act does not profess to rescind the former act, nor could -the legislature which passed it so have intended, or to alter it in any other particulars than those it enumerates. As neither the arches or their dimensions were mentioned in this act, it is but fair to presume the legislature intended they should be built according to the requirements of the original act. By the amendatory act, Coles was authorized to build a dam, and directed so to construct it as to be the foundation of “ the bridge aforesaid.” Now what bridge was meant by the bridge aforesaid ? It was the bridge referred to in the preamble of the act, which was the bridge authorized to be built by the act of 1790, in which the dimensions were parfciculrly specified; and especially the distance between the centre arches, which was not altered by any subsequent act.
Nor can I come to the conclusion that the bond required to be given prevents a proceeding by an information in the nature of a quo warranto, found ed on the breach of a condition on which the franchise was originally granted. The statute required the bond for no such purpose, nor could the legislature so have intended it. The bond was given to obligate Coles to build the bridge within four years from the passage of the act, and to preserve it in good and sufficient repair during the term of sixty years ; but was neither designed to create a forfeiture of the franchise, or to excuse it from forfeiture, either for nonuser or misuser. Its object was to enforce the building of the bridge within four years, and to compel tho proprietor to keep it in repair : but it attaches no penalty for the neglect of either : true it is a penal bond, but the penalty does not as a matter of course attach on a breach of the condition; iti case of a breach, the obligees would be liable to an action, and although the judgment would be for the penalty, yet the damages only would be assessed and recovered. The statute, therefore, has provided no penalty ; it has provided only an accumulative reme[*562 ] dy. This, therefore, is not like the case of The*Commonwealth v. Breed, 4 Pick. 466, in which the court held, that as the pen *562 alty for any unnecessary delay in raising the draw of the bridge was fixed by statute, any neglect of that kind would subject the owner to the penalty, but would not operate as a forfeiture of the franchise. When a statute provides a penalty for the breach of a particular condition, no other penalty can attach ; for the fair presumption is, the legislature intended it as the whole penalty for that particular breach. But such a penalty would not save the franchise from forfeiture for nonuser or misuser in other respects. So where the legislature has prescribed certain conditions on which a corporation shall forfeit its franchise, those conditions supercede the common law, and are the only conditions which are to work a forfeiture. But where the act is entirely silent as to what shall create a forfeiture, the common law doctrine applies in its full force, and such I conceive to be the nature of the statute granting the franchise in the case now under review.
It is insisted that an information in the nature of a quo warranto, is nob the appropriate remedy to annul or vacate a franchise which has been duly granted to an individual, upon the ground that it has been subsequently forfeited by an abuser or misuser of the franchise. Although the right to build the bridge in question and take toll was granted to an individual, it was for the acccmmodation of the public and was a public-franchise, and so are all grants of a similar nature, as well as the grants for public roads and ferries. '} he statute authorizes the attorney general to file an information in the nature of a quo wairanto in the supreme court either upon his own-relation or u¡ on the relation of a private party against any person, who shall unlawfully hold or exercise any franchise within this state ; and when adjudged guilty of unlawfully holding or exercising any franchise or privilege, judgment shall be rendered that such defendant be ousted and altogether excluded from such franchise or privilege. 2 R. S. 584, 6, § 28 and 48. Under this statute I have no doubt the attorney general may file his information charging an individual or corporation with holding or exercising a franchise unlawfully, and whether the holding *or excrcis- [ *563 ] ingbc unlawful or not, is the point in issue to betried ; and if the fact apj car to be that the holding or exercising is unlawful, he maintains his suit and is entitled to judgment; if not. he fails of course. It appears to me therefore that sufficient is alleged in the information to bring this case within the statute. The words of cur statute are similar to the English statute, under which proceedings of this kind have been frequently sustained. It has been repeatedly held to lie against, him who abuses- his franchises. 7 Comyn’s Dig. Quo Warranto, (A) 190 2 Inst. 496. 2 T. R. 567. 5 Mass. R. 230. It is in the nature of a writ of right, and is brought in cases of nonuser, or misuser, or abuser, to enquire by what authority the individual or corporation claims to exercise the rights of a franchise, 1 Bl. Comm. 2G2 ; and has been applied to the mere jurpese of trying the civil right, seizing the franchise- or ousting the possession, even pre *563 vious to the time of Lord Coke. 1 Coke Inst. 281. 3 Burr. R. 1817. I have no doubt therefore that the proceeding by information in the nature of a quo warranto is the appropriate remedy in the casé under review.
Nor does it appear to me that the objection taken that the information is not adapted to the case, and that there is no fact found by the verdict to sustain it, is tenable. The information charges that Samuel M. Thompson, Samuel Flewwelling, William F. Coles and Isaac U. Coles, for the space of one whole year last past and upwards, have claimed, used and exercised, and still do claim, use and exercise, without any lawful warrant, grant or charter whatever, the following liberties, privileges and franchises: to have and maintain a bridge, &c. over Harlaem river, being a public river, and of asking, demanding and taking toll from all persons crossing and using said bridge, &c. It therefore charges them substantially with exercising and claiming to exercise this franchise unlawfully, and calls upon them to shew by what warrant or authority they claim to use it. To this information they answer that they have a grant from the legislature, and the jury [ '*564 ] find by their verdict they have not complied with its Requirements. How then can they call upon a court of law to say they are entitled to the privileges conferred by that grant.
But it is said that the omission to continue the opening between the centre arches of the bridge to the full extent of the twenty five feet, is not a violation of any condition on which the title to the franchise depends: that it was a condition subsequent, and that if the attorney general relied upon it, he should have replied it, to enable the defendant to have rejoined new matter, &c. This however I apprehend is not the true construction of the statute under which the franchise was held and exercised, nor would it be the correct rule for pleading in cases of quo warranto. The defendant by quo warranto is called upon to show his title to show by what authority-he claims and exercises his franchises, and must at once show a complete title. The affirmative lies upon the defendant, and the people have only to answer. An information in the nature of a quo warranto need not show title in the people, the law presumes the people the primitive source of title, and calls upon the intruder to show by what authority he claims to hold or exercise the privileges of the franchise ; and if the title set up is incomplete, the people are entitled to judgment. Rex v. Leigh, 4 Burr. R., 2147. The People v. Utica Ins. Co. 15 Johns. R. 388. Regina v. Blagdon, Gilbert’s Cases, 149. 2 Kyd on Corp. 399, &c. The question then is, did the corporation show on the record a perfect title in itself to exercise the privileges of its franchise ? The statute authorized a bridge to be built across the Harlaem river at Morrissania, of a width not less than thirty-five feet, between the centre arches of which there should be an opening not less than twenty-five feet, over which there should be a draw not less than twelve feet, for the passage of vessels with fixed standing masts; and by a subsequent *564 act the width of the bridge was altered to twenty-four feet, but in other respects the dimensions remained the same. For the use of the bridge, Lewis Morris, his heirs and assigns, were authorized to receive toll for the term of sixty years. Under the statute the defendants aver in their plea among other things, that *they built a bridge, the width of [ *565 ] which was, and ever since has been, and still is, not less than twenty-four feet; and between the centre arches thereof, there was, and ever since has leen and still is, an opening not less than twenty five feet; over which there was, and ever since has been and still is, a draw not less than twelve feet,, for the free passage of vessels with fixed standing masts. To this plea the attorney-general replied, that “ the said John B. Coles, did not build a bridge from Harlaem across Harlaem River to Morrissania, the width of which was and has been, and is not less than twenty-four feet, and between the centre arches whereof there was and hath been and is an opening not less than twenty-five feet, over which there was and has been and is a draw not less than twelve feet, for the free passage of vessels with fixed standing masts, as in the said plea is alleged. On this issue thus formed the jury have found among other things, by their verdict, that since the year 1825 until the commencement of this suit, there was not an opening between the centre arches of the width of twenty-five feet, but that at all times since the year 1825 to the commencement of this suit, the said opening was less than twenty-five feet. Here then was an issue tendered on the part of the defendants and traversed on the pari of the people, and found against the defendants by the jury. This then being the issue tendered by them and found against them, can they be permitted to disregard it after verdict ? If it is a material issue, they cannot; they would not even be entitled to a repleader. Rex v. Leigh, 4 Burr. 2145, 6, 7. The question then returns, was this a material issue ? and upon this point, it appears to me, the fate of this cause is mainly suspended. Do not the defendants by their own plea admit that it is material for them to show the fact averred by them, in order to entitle themselves to exercise the privileges of their franchise ? They tender it as a material averment, and shall they be permitted to say, after, issue joined and after verdict: true, we tendéred it as a material issue, but it is immaterial and ought not to prejudice our rights ? If immaterial, why was it tendered ? It is said from a misconception of thfe pleader. Why not then move *for a repleader [ *566 ] after issue joined and before verdict 1 Why throw upon the record an immaterial issue and sleep upon it until after verdict ? But in order to show its immateriality, it is said, that although the statute required a bridge to be built of certain dimensions to enable the proprietor to receive toll, yet the continuance of it of those dimensions was a condition subsequent; and before the franchise could be forfeited for a breach of a condition subsequent, the people should have averred the same with requisite precision, and *566 the defendants been permitted to answer. Such a principle once admitted would, in my judgment, reverse the whole order of pleadings in cases of quo warranto. The people call on the company to show by what authority they exercise their franchise; they must show it to protect their rights, and the people have only to answer their allegation. The question is not what once entitled them to exercise these rights, but what entitles them to exercise them at the time the action is commenced. Whether it is a consideration to be performed before the charter goes into operation, or to continue with the charter, is wholly immaterial, provided it be a condition necessary to entitle the company to exercise its franchise. It cannot vary the rule of pleading, when a corporation is called upon to show by what authority it exercises its corporate rights. Now can any one doubt but that it was necessary to continue the bridge of the same dimensions, as it was to construct it of those dimensions to comply with the statute and entitle the corporation to receive toll; and that this was as much a condition co-extensive with the grant, as the original construction of ihe bridge ?
I am aware that in the case of The People v. The Manhattan Comp. 9 Wendell, 351, that the supreme court say that it is only necessary for the defendants to set forth enough prima faeie to show title, and if any thing exists to defeat it, the plaintiff must shew it — and they cite 1 Chit. Pl. 301, and other cases relative to pleading in civil cases; and as a general rule of pleading in such cases, it is correct, that the plaintiff must depend upon the strength of his own claim, and not upon the weakness of his ad- [ *567 ] versary. But *1 am not aware that this principle in pleading has ever before been applied to the pleadings in a case of quo warranto, nor can I concede the propriety of so applying it. The court has given no authority for so doing, and it appears to me to pervert entirely the true doctrine of pleading in these cases. If the doctrine is, that the people need not shew title, and that the onus of shewing a complete and perfect title, rests upon those who claim the right to exercise the franchise, which seems to be recognized by all the authorities, except the one alluded to, it appears to me that in no case could the corporation justify, by shewing a prima facie right. It is said in 2 Kyd on Corporations, 399, that “ the defendant to this particular writ, might either plead or disclaim ; if he plead, it was incumbent on him to shew a complete title against the king, 9 Co. 28, a. : in which respect there is a remarkable difference between this proceeding and a civil action. In the latter the plaintiff must recover by the strength of his own case, and must not rest upon the weakness of the defendant’s plea, for however defective the latter may be, yet if the plaintiff do not shew cause of action, he cannot recover ; but as all franchisesjire derived from the crown, the writ of quo loarranto shews no title in the king to have the particular franchise exercised by the defendant, but calls upon the latter to know by what title he claims it; and if the title he sets forth is in *567 complete, he (the king) is entitled to judgment.” And as all franchises are derived from the crown in England, so here all franchises are derived from the people. The principles here laid down are quoted with approbation, and adopted by Judge Spencer, in delivering the opinion of the supreme court in the case of The People v. The Utica Insurance Company, 15 Johns. R. 388, and is, I apprehend, the true doctrine on this subject. If I am correct then in the view I have taken of this part of the case, the people could not have been called upon in their replication to the defendants’ plea, to have averred a breach of the condition on which the rights of the franchise were exercised. This would have thrown the onus of proving that breach upon them, and have compelled them to take the affirmative, contrary to the very principles on which the *writ of quo warranto [ *568 ] issues, and would entirely pervert the order of pleadings in such cases.
If the defendants wished to contend that the arches were not twenty-five feet, but were a trifle less, so much so as to render the diminution immaterial, and that it ought not to affect their right to the exercise of the privileges of the franchises, they ought so to have pleaded, for they had the affirmative in making out their title. In order to test the strength of this position, suppose they had so pleaded, would not such a plea have been demurrable, as not complying with the requirements of the act under which they claim to exercise their franchise ? But as the case now stands, by what authority do the counsel call upon us to say this might have been an immaterial diminution ? So far as we are authorized to draw an inference from the finding of the jury, are we not to presume directly the reverse ? As there was no exception to the charge of the judge, are we not to presume he charged them that an immaterial diminution would not authorize them to find a diminution, and to presume that unless they found that the diminution was material, they would not have found a diminution at all ?
But again, was not this a material issue ? Was it not necessary for the defendants to maintain it, in order to comply with the requirements of the statute, and to entitle them to the right of exercising their franchise ? What kind of a bridge authorized the defendants under the act to receive toll ? Precisely such an one, and of such dimensions, as the act prescribed. They pleaded they had built such a bridge, and still maintained it. Now, is it noi as material for them to continue the bridge of the same dimensions to enable them to exact toll, as it was for them to build it of the required dimensions ? The public have a continued right to pass over such a bridge, and for the passage and use of such a bridge, the defendants have a continued right to exact the toll allowed by the act. Can it be doubted, therefore, but that it was material, at the time this information was filed, that there should be such a bridge ? Could they once have built siich a bridge, and subsequently have altered it to one pf entirely different dimensions, and still exact *569 [ *569 ] toll without legislative authority ? If so, why did they ask the legislature to authorize the reduction of the width from thirty to twenty-feet ? To have set out the dimensions and averred in their plea they built such a bridge, would not have answered the quo warranto. The question was, were they assuming the right of asking toll without such a bridge as the statute required, at the time the information was filed ? They must show their title — the right to exercise the privileges of their franchise in presentí, The People v. The Bank of Niagara, 6 Cowen, 211; and it is no answer to say they once built such a bridge as they were required to build by the act. Suppose a portion of the bridge had been swept away by the current, and that by means of a plank thrown across the chasm, footmen still could pass; would it be pretended the defendants would have a right to exact toll ?
In whatever way I can view this point, I think it was material ; that the issue upon it was rightfully and properly joined, and a verdict having been found against the defendants, the people were entitled to judgment. It is true, the jury in this case have not found a forfeiture, nor was it their duty to have done so. They have found the defendants had not such a bridge as the statute required them to have to entitle them to exact toll, and having so found, it is for the court to pronounce the judgment which must necessarily follow. 2 R. S. 485. I am for affirming the judgment of the supreme court.
By Senator Furman.
There are certain immunities and privileges in which the public have an interest as contradistinguished from private rights, and which cannot be exercised without authority derived from the sovereign power; and such immunities and privileges are franchises. In England, a privilege in the. hands of a subject, which the king alone can grant, is a franchise ; and so with us, a privilege or immunity of a public nature, which cannot legally be exercised without legislative grant, is a franchise ; and in both countries there are franchises other than offices, which may [ *570 ] be usurped, or illegally used. To “provide against the abuse of these franchises, and their perversion from the purposes for which they were designed, the information in the nature of a quo warranto has been used, which is a substitute for the ancient writ of quo warranto which has fallen into disuse ; and this information, which has superseded the old writ, is defined to be a criminal method of prosecution as well to punish the usurper, by a fine for the usurpation of the franchise, as to oust him, and seize it for the government. It has, however, for a long time, been applied to the mere purpose qf trying the civil right, seizing the franchise, or ousting the wrongful possessor ; the fjne bring nominal only, The People v. The Utica Ins, Co. 15 Johns, R. 387.
Tbe parties proceeded against in this matter are not a corporation, possess *570 ing the powers incident to that representative of the sovereignty of the people, but an associotion of individuals holding a franchise granted by the legislature, and which is to be held and used in a particular manner, and no other. But the rule applies equally to them as to corporations. It has been urged, that “ as the judgment of ouster in this case is founded, not on original usurpation of the franchise in question, but on its forfeiture by subsequent breach of condition, that an information in the nature of a quo warranto, especially on the relation of a private person, and without express leave of the court, is not the proper legal remedy for vacating a franchise lawfully acquired but subsequently forfeited in the hands of individuals claiming not as corporators, but as natural persons ; and it is argued that by the common law, a scire facias, and not a quo warranto, is the sole appropriate remedy, and that the present case of a franchise in private hands, forfeited by breach of its condition,' is not within our revised statutes regulating and extending the practice of informations in the nature of quo warranto.” The revised statutes, 2 R. S. 581, 583, have in effect provided that such information may be filed on the application of private individuals, without leave of the court; and scire facias will lie to revoke a grant or act of the supreme legislature in any instance. The statute, 2 R. S. 585, § 48, in itself provides for a case where the defendants came legally into possession of their franchise, and *have forfeited the same by some mis- [ *571 ] user ; and in fact, the absurdity of giving judgment of ouster against a person from a franchise which he never held, seems to have attracted the attention of the supreme court at once upon its presentation.
It has been urged also, against sustaining this proceeding, that the attorney general is bound, on an information in the nature of a quo warranto, to state in his replication to the plea of the defendants the special and particular matter upon which he relies as working a forfeiture of the franchise, in place of taking an issue generally or specially on the matter of defence stated in the plea. It may be that such would be the best course of practice, if we were now at liberty to adopt a new mode of pleading ; but it is not in accordance with the long established practice of the court, both here and in England. As I understand the rule, it is as follows : Where the information questions a present right of any defendants to have or use any corporate rights or franchises, those defendants must in their plea set out the matter specially, as it forms their defence ; and upon that plea the attorney general takes issue, (unless he chooses to allege, by way of replication, some new matter,) and is not required to specify the charges upon which he relies as matter of forfeiture. All such new matter alleged in the replication, or otherwise, by the attorney general, is in fact a new information, and must be pleaded to by the defendants until an issue be formed. So in the celebrated quo warranto case of the city of London. The attorney general by information charged that the mayor, &c. of London claimed and used without law *571 ful authority : 1. To be a body corporate ; 2.. To elect sheriffs ; and 3. to be justices, and hold sessions, &c. — all which liberties and franchises, &c. they usurped, &c. To this information, the defendants pleaded their charters and confirmations, and right to elect sheriffs, and also letters patent declaring them justices, &c. Upon this plea, the attorney general replied that they were not a corporation, and had no right to elect sheriffs, &e. and on it put himself upon the country,-&c. — thus, joining issues to be tried by a jury • in the same manner as in the present case. The attorney gen- [ *572 ] eral then indeed went on and *alleged new m atter, and urged in fact a new information against them, alleging subjects no way com nected with their corporate franchises, and the defendants pleaded to it until an issue was joined on the one side or the other. ' This case has been blackened and traduced through all history,-but for what cause, so far as the court was concerned, I must confess I am unable to discover. The counsel for the city (Mr. Pollexfen and Sir George Treby) were heard with patience and without interruption for many days, and through two different arguments ; and at the conclusion of the second argument, the attorney general, Sir Robert Sawyer, moved.' the court to appoint a day for judgment, which was refused ; the chief justice remarking that the attorney general might move the court at the-end of the term, when they might say something on the subject. Justice Jones remarked, “ For my part, I desire as great light in this case-as I can possibly have before I give my opinion ;” and Justice Raymond observed, “ There are a great many precedents to be looked into, and we cannot study in term time.” This does not look as if the judges had predetermined to forfeit the franchises of the city of London, but on the contrary, as if they had heard the case fairly and faithfully, and were determined to study and examine it before they gave their judgment. I have never seen the law of this quo warranto against the city of London questioned in any case, or by any court. It is true, it has been denounced as an act of tyranny ; riot, however, because of any thing inherent in the proceeding itself, but by reason of the abuse of that mode of proceeding during the reign of James II., in its having been extended to every corporation and considerable franchise in the kingdom. It would have been an equal act of tyranny for the king to have directed his attorney general to have commenced and prosecuted actions of assumpsit against every man" of note and wealth in his dominions ; and yet no man of sense would have regarded the action of assumpsit as containing in itself any thing essentially tyrannical.
Counsel of eminence have held that the information, and not [ *573 ] the replication; should contain the special and particular *cause of forfeiture ; and so it was urged in The People v. The Bank of Niagara, 6 Cowen, 196, by the late A. Van Vechten. He insisted that the information was bad because it did not state any cause of forfeiture, and *573 that the defect could not be supplied by the replication ; that the attorney general has no right in his replication, for the first time, to set up any new. matter as a cause of forfeiture.
Upon a careful examination of the pleadings in the case of the City of London, and the several quo warranto cases in this country, I have arrived at the conclusion, beyond a reasonable doubt, that the mode of pleading adopted in this case is the proper and legal method, unless in cases where the attorney general, from the matters of defence or excuse set up in the defendant’s 'plea-, deems it necessary on behalf of the people to allege some new matters as a further cause of forfeiture. This will be found to have especially been the case in the proceeding against the City of London.
It was also insisted for the plaintiffs in error, that the matter of forfeiture here charged and found, is immaterial, and of no public importance. The answer to this is, that all franchises are granted upon the condition that they shall be used in the manner prescribed. So says Holt and Blackstone. These conditons are precedent and continuing: and upon the exercise and performance of which the very life of' the franchise depends* — it is its vivifying principle — and if withdrawn by the non-performance, the franchise is dead. Whether these conditions thus imposed by the legislature are material and necessary to be performed, is not a matter of question, and never can be. Their importance is settled and admitted by the defendants upon their acceptance of the franchise. It appears upon the pleadings in this cause that the stream crossed by this bridge is a navigable arm- of the sea, and therefore any. provision which has for its object the- preservation of the navigation of it, is in itself material, from legal presumption; so that the materiality of this opening in the bridge, and of the extent defined by the legislature, is settled and ascertained beyond dispute. To hold any other or different doctrine, will truly make all the corporations and holders of franchises in this state perfect Monopolies, and place them be- [ *574 ] yond the reach of legislative supervision or control. There never can be any reasonable fear of oppression in keeping these franchises under the government of the people ; but there will be great danger, if we ever permit the holders of those franchises to become independent and out of the reach of the law; they, (if any ever will,) will be the oppressors in this land — and unless we are prepared to decide, in effect, that individuals or corporations taking grants from the legislature, are at liberty to obey or reject just so much of the express and positive conditions of their grant as they may find it convenient, we must hold them strictly to the performance of their duty.
Again: it has been urged that to affirm the judgment of the supreme court, will endanger and probably destroy all corporations and franchises for small and immaterial departures from the conditions of their respective grants ; and that this is the more to be feared because there is no seizure, but judgment of ouster. It is, in my judgment, better to trust the people at *574 large, represented in their legislature, than those individuals who have only their own private advantage and not the public convenience to look to. And again: the people in their supreme legislature have seen fit to change the form of the judgment in such cases, and that is a full and perfect answer to the subject. No one can question their right to make this change, and the presumption necessarily is, that there were good and sufficient reasons for such enactment. The loss to private individuals could never be commensurate with the great evil which would result to the public from permitting the grantees of great and important franchises to avail themselves of their advantages without performing their conditions ; to give them the benefits And privileges resulting from their use without rendering in return to the public the duty which they owe.
It has also been contended that there is no evidence that the jury ever passed upon the materiality of the diminution in the opening in this bridge. It was the duty of the judge presiding at the trial to direct the jury, that unless they were satisfied it was material, they must find a ver- [ *575 ] diet for the defendants, *and we must presume that the judge has done his duty. Besides, the defendants had their counsel present to look after their rights and see that the judge and jury performed their duty on the trial.
I am for affirming the judgment of the supreme court.
By Senator Verplanck.
I. There is a preliminary question in this cause to be settled before proceeding to the more important enquiry a s to the principles upon which its decision must utterly rest. As the judgment of ouster in this case is founded not on original usurpation of the franchise in question, but on its forfeiture by subsequent breach of condition, is maintained that an information in the nature of a quo warranto, especially on the relation of a private person, is not the proper legal remedy for vacating franchises lawfully acquired, but subsequently forfeited in the hands of in-individuals claiming not as corporators, but as natural persons. It is argued that, by the common law, a scire facias and not a quo warranto is the sole appropriate remedy; and that the present case of a franchise in private hands, forfeited by breach of its conditions, is not within our revised statutes regulating and extending the practice of information in the nature of quo warranto. That statute, 2 R. S. 581, 583, provides that “ an information in the nature of a quo warranto may be filed by the attorney general on his own relation or upon the relation of others when any person or association usurps or unlawfully holds any public office or franchise.” A subsequent section authorizes judgment of ouster “ whenever any defendant, whether a natural person or a corporation, against whom an information in the nature of a quo warranto shall have been exhibited, shall be found or adjudged guilty of usurping, intruding into or unlawfully holding or exercising any office, franchise or privilege.
*575 The matter here in controversy being the right to build and keep a toll bridge over a public and navigable stream, this is admitted to be a franchise, within the meaning of the act. If then it be held unlawfully by any person or association, the statute clearly provides the remedy. The *words “unlawfully holding,” in their ordinary sense, appear to [ *576 ] express and include the holding after cause of forfeiture, and the ceasing of the legal right as against the state. But, it is argued that this obvious plain meaning is excluded by a well known legal doctrine; it having been repeatedly decided that no advantage can be taken in any collateral action, of misuser, or nonuser, or other cause of forfeiture of any corporate franchise; and the same reasons apply to all other franchises. Such franchises, therefore, have all the rights and character of lawful property until the default and forfeiture be judicially ascertained and pronounced. Thence it is inferred that all franchises are to be considered as lawfully held until judgment of ouster is pronounced, although the forfeiture may have been actually incurred. I cannot assent to this construction. It gives by mere inference an artificial and forced meaning to the statute deduced from a wholly distinct rule of adjudicated law, and contrary to its natural meaning and obvious intent. The rule that “ no corporation is to be adjudged dissolved, until it has been called to answer for the breach of its condition,” Slee v. Bloom, 5 Johns. Ch. R. 366, is founded on justice and sound public policy, as well as on the analogy of our law of estates upon condition. The state alone has the right of re-entry. The state alone can resume its grant. Until that is done, the holders of the franchise must of necessity, and for the safety of all who-have any transactions in relation to it, be presumed to have the right to that authority which the state itself permits them to hold out to the world ; but as against the state, the franchise is unlawfully held, for it is forfeited by breach of the conditions upon which it was granted. The judgment of ouster is pronounced against those, who, in the words of the statute, “ shall have forfeited their franchises.” The unlawful holding, after forfeiture, is the very foundation 'of the judgment. The statute itself requires that the defendants should “ be found or adjudged guilty of usurping or unlawfully holding” before judgment of exclusion from the franchises can be rendered. This interpretation of the act hardly needs the aid of authority; but were it less clear than it appears to *me to be, I should regard it as settled by the legal [ *577 ] and judicial interpretation constantly given to these words in former acts of parliament and of this state, under which known and received sense they have been incorporated in our revised statutes. The English act of the 9th of Anne uses these words “ unlawful holding ” as to offices, franchises, &c. and under its provisions proceedings are common to eject those who forfeit franchises by misuser. The same words are used in our own statute of 1788, on this subject, and were the only words in the act which *577 could apply to the case of franchises once legally held and afterwards forfeited. But proceedings under this act, our revised statutes, for such forfeiture were held valid and the pleadings good, in the several cases against delinquent hanks reported in 6 Cowen's R. The act of 1788 is embodied and referred to in the act of 1825, upon which those information were brought.
Looking at the object and intent of the act, it seems very improbable that forfeited franchises in the hands of individuals should have been intentionally omitted and left to stand on a different footing from corporate ones. That sense of the words of the statute, which consistently with ordinary use and legal construction, includes such cases, is therefore the most probable meaning in conformity with the object and intent of the legislature. But-so far as this probable intent can give a construction, it agrees with the more customary and obvious sense of the words employed, and both harmonize with the law and proceedings of quo warranto, according to the common law, which defined it to be “ a writ, commanding the defendant to show by what warrant he exercised any franchise, having never had a grant of it, or having forfeited it by neglect or ábuse.’, 3 Black. Comm. 262. High authorities indeed state the proceeding by scire facias to be an appropriate remedy in the latter case. Among them are Chancellor Kent, 2 Comm. 313, and Lord Kenyon, 3 T. R. 199. But they do not speak of this as the exclusive remedy, nor has it any advantage in justice or precision over proceeding on a quo warranto information, if those proceedings and [ *578 ] pleadings are conducted according *to the right and usual practice, and approved precedents of that mode of public prosecution.
II. But this case involves questions of higher importance, such as may hereafter affect great and complicated interests ; for it mainly depends upon the manner in which one fundamental principle is settled. It also presents other points of technical law, as well as some questions growing out of the local acts under which the Harlaem bridge was built and is now held.
Stripping away all questions of form and laying aside the circumstances peculiar to those local acts, we shall find the great inquiry which we are now to answer by our adjudication to be simply this : When privileges or. franchises granted by the state to individuals or corporations have been fully vested by due.performance of the preliminary conditions of the grant, what sort or degree of neglect or transgression of the duties or conditions subsequent, whether prescribed or implied, amounts to a violation incurring the penalty of forfeiture ? - When that question is clearly settled, it will not be difficult to ascertain the just and legal mode of enforcing such forfeiture in conformity with our statutes and the rules of law.
Before entering upon this inquiry I must state, that I concur with the chief justice in his construction of the several acts under which the bridge was built, and also agree with him that the bond taken under the acts was *578 but a cumulative security for erecting the bridge and preserving it in good repair, not excluding any other common law or statutory remedy, civil or criminal, whenever the proper application for such remedy should be presented. In addition to the reasons urged by the chief justice, from the very absurd and inconvenient consequences that a different construction would authorize, I consider the act as governed by another more general and very sound rule of interpretation : that “ a statute in the affirmative, without negative words, does not take away the common law.” 2 Inst. 200. 5 Coke’s R. 63. This applies specially to remedial provisions by statute. 11 Coke’s M. 63. See also various cases collected in Comyn’s Digest, Parliament. The good sense of the rule commends it without the aid of authority.
*Let us pass to the chief and far more interesting subject of in- [ *579 ] vestigation.
The older English authorities (as Finch) define franchises to be “ branches of the royal prerogative subsisting in the hands of a subject by grant from the king.” 3 Cruise Dig. 278. They regarded such franchises as being mere donations of the sovereign, to be treated strictly and jealously. In their day they commonly were so. But the advance of liberty, of commerce and the arts and conveniences of life, have given to franchises a higher character of public utility. They have become contracts between the sovereign power and the private citizen, made upon valuable consideration, for purposes of public benefit as well as of private advantage. I therefore prefer and adopt the definition of Chancellor Kent. “ Franchises are privileges conferred by grant from government and vested in private individuals. They contain an implied covenant on the part of the government not to invade the rights vested, and on the part of the grantees to execute the conditions and duties prescribed in the grant.” 3 Kent’s Comm. 458. I refer also to the unanswerable remarks of Chief Justice Spencer, in The people v. Utica Ins. Co. 15 Johns. R. 387, on the total inapplicability of the old English definition to our modern legislative grants.
Such a grant is a property. In the words of Chancellor Kent, “ an estate in such a franchise, and an estate in land, rest upon the same principle, being equally grants of a right or privilege for a valuable consideration.” It is, in the language of the civilians, a private property affected by a public use. Acts granting such franchises are recognized by the repeated decisions of the supreme court of the U. S., and by all the highest American authorit-ies, as contracts. Now in relation to contracts made by a state, the supreme court of the U. S. have laid down this rule '. " This is a contract, and although a state is a party, it ought to be construed according to the well established principles which regulate contracts generally.” 3 Cranch R. 1. “ That is,” says Judge Story in a more recent case commenting upon the one cited, “ precisely as in cases between mere private persons, taking into consideration the nature and object of *the [ *580 ] *580 grant.” 2 Peters’ R. 611. A like rule was applied by the supreme court of the U. S. to the case of a contract made by the United States. U. S. v. Gurney, 4 Cranch, 333.
These rules and definitions apply alike to the joint privileges of corporate bodies, and to those private grants which, as that before us, confide the execution of some public duty to individuals. In return for the road, ferry or bridge kept up by them, the state grants rights of toll or other lucrative privileges. All such grants and privileges and charters rest on the same ground, whether considered as contracts between the state and the citizen, or as property vested in the grantees. This consideration gives great additional importance to the case now under review.
The charters and franchises of modern times are contracts made for public consideration and advantage. They may occasionally be unwise and injurious, but their general result is most beneficial to the best interests of society. On the faith reposed in them, capital is largely and usefully invested ; roads, bridges and canals are constructed ; schools, colleges, libraries, hospitals, and other institutions of education or beneficence are founded. The grantees who risk their funds or apply their enterprize and industry in such investments or undertakings, have, indeed, most commonly, like other persons who make bargains and contracts, their own personal interests in view. They are, therefore, not entitled to claim any special and peculiar favor above other men, in the eye of the law. But they have a right to strict and equal justice. The sovereign authority has no peculiar privileges as against them. They are entitled, on every principle of public policy as well as of natural' equity, to have the same general rules of justice applied to their contracts with the state, which regulate contracts and estates on condition as between one private citizen and another. Questions touching franchises are therefore to be examined upon the principles of sound reason, as applied to the settled doctrines of the common law in trusts, covenants and contracts between man and man.
There are two distinct characters under which we may consid- [ *581 ] er a grant or franchise for public use and benefit, ^whether it be held by individuals or by a body corporate. It is an incorporeal property or estate derived from a contract, and held on certain conditions to be duly executed according to the terms express or implied of the grant or charter. But as it is a private property affected by a public use or interest, it may also be rightly considered as a public trust to be faithfully discharged according to the purposes of its creation. Let us first consider it as a public trust.
It is the grant of a public trust, beneficial alike to the trustee and to those' for whom it was established. Now, reason and legal authority unite in pronouncing the only just ground of forfeiture of such a trust, once made and vested by full performance of all preliminary conditions, to he3 cither, 1st. *581 the total neglect or nonuser of its duties, or else 2d., an abuse of them, by discharging them negligently, imperfectly, ignorantly or fraudulently. Such is, in brief, the law as stated by Cruise, the best text writer on the law of real property. 3 Cruise Dig., 302. Such also is the doctrine of our own revised statutes, which distinctly recognize forfeiture by corporations of their franchises as incurred either by misuser or nonuser.
What then is a misuser, or (as it is called by Lord Coke and others) an abuser ? I cannot reply better than in the words of Chief Baron Comyns, one of the very few compilers who can be safely cited as positive authority, but of whom Chief Justices Kenyon and Best have successively said “ that his dictum alone, even when he cited no case, is of itself of the greatest weight.” 3 D. and E. 631; 5 Bing. R. 388. ‘‘ Franchises, says Comyns, may be forfeited by breach of the trust on which they were granted, and perversion of the end of the grant or institution." So a corporation may be forfeited if the trust on which it was created be broken, and the institution perverted. Per Ch. Justice Holt, Shower R. 280. 4 Mod. R. 258. And again, “ Franchises may be forfeited by misuser or abuser or other misdemeanor in him, to whom they were granted.” Comyn’s Digest, Franchises, G., 3. It would appear then that the misuser must be such a neglect or disregard of the trust, or such a perversion of it, to the private purposes of the trustee *or holder of the grant, as in [ *582 ] some manner or in some degree to lessen its 'utility to those for whose benefit it was instituted, or else to work some other public injury. It must be in some sense or other ‘‘ a misdemeanor,” in violation of the objecof the trust.
Thus again; Lord Coke in the Earl of Shrewsbury’s case, explains the term misuser, whereby the analogous franchise of a patented office was forfeited, by the example of a judge taking a bribe, &c., after which and similar examples of perversion of official trusts he adds : “ Franchises like offices, may be forfeited by abuser.” 9 Coke R. 50. In conformity with these doctrines of the old English law, which still retain their full authority, Chief Justice Spencer, 15 Johns. R. 387, speaks of proceedings in quo warranto as being “ well defined as a criminal method of prosecution, as well to punish the offender as to oust him from his franchise.” Accordingly our revised statutes enact that judgment of ouster shall be rendered only “ when the defendant shall be found or adjudged guilty of usurping or unlawfully holding or exercising any office, franchise or privilege.” 2 R. S. 583.
In almost every charter or grant of franchise, there may be found many minor duties, sometimes expressed, often implied; none of which are strictly essential to the due execution of the trust. These ought to be performed; still if executed substantially though not to the very letter, or if by change of times they become useless, they may be neglected without perverting the objects of the grant. For the neglect of these when any person is aggriev *582 ed, the law has provided various fit remedies, short of that of forfeiture, which the authorities just cited regard as reserved for a violation of the main objects of the trust. Such minor omissions of accessory ^duties seem well left to the writ of mandamus, of prohibition, of injunction, or to indictment or civil suits for damages. Sometimes, as in the present case, the cumulative remedy of a pecuniary penalty is added by special statutory provision. It is true that our revised statutes authorize the filing of an information against corporate bodies “ whenever they shall offend against any [ *583 ] of the provisions ‘of the act creating such corporation.” But as the judgment can only he pronounced upon a finding of “ guilty” of unlawful usurpation or holding, the question whether such offence amounts to cause of forfeiture or not, is still open to inquiry and must depend upon the terms of the grant and the nature of the offence.
The distinction between provisions purely directory, and those vital and essential to the objects of the trust or grant, runs through our statute hook. It may be traced in almost every law touching franchises, charters or public trusts. In our general act regulating corporate franchises, there are some provisions, the breach whereof is legislatively declared to work a forfeiture. As to the neglect of others, the statute is silent, leaving the offence to the appropriate remedies provided by law. Thus in 1 R. S. 594, monied corporations are required to make out a statement of their affairs and condition annually, and to transmit it to the comptroller on the first Monday in each year. This is so far purely directory. But it is moreover enacted that, “ Every corporation that shall neglect to make out and transmit such statement for one month beyond the period required, may be proceeded against and dissolved.” The neglect of this regulation for more than a month works a forfeiture. But the law clearly does not make it cause of forfeiture, if the report is not made on the precise day fixed by law. Nevertheless it is still a duty, and a breach of it would make the offending corporation responsible in various ways, civilly and criminally, if any public or private injury should result from not reporting on that very day. It is on this same principle that the supreme court of Massachusetts decided not long ago in a case somewhat resembling the present, that when the legislature authorized an individual to build a bridge, and imposed a penalty for unreasonable delay to raise the draw, that the penalty was the remedy, but that no forfeiture was incurred by mere delay. Per curiam, per Morton, J. 4 Pick. R. 460.
Upon these grounds I come to the undoubting conclusion, that to form a sufficient foundation for a judgment of ouster for the forfeiture [ *584 ] of any franchise, not originally usurped but ‘legally vested, the verdict must expressly find the party (as the statute requires) guilty of an unlawful holding by reason of some misuser or neglect, going to pervert or destroy the object of the grant, or else of some misdemeanor in the trust, injurious to the public. Now this should be made to appear affirm *584 atively on the record. But that can only be done by the cause or reason of forfeiture being expressly charged and expressly found, either generally as to the unlawful holding, or specially as to some particular fact conclusively shewing to the court a forfeiture and consequent unlawful holding.
I cannot bring myself to say, with the able but unscrupulous attorney general of Charles II, that “ if courts be doubtful of the facts, the best and safest way is that judgment be given of seizure.”
But a franchise has also the legal character of a property or estate. Thus it is regarded by Mr. Cruise, by Chancellor Kent, and other eminent jurists on both sides of the Atlantic. It is so considered by Blackstone, who explains the word tenement, “ to signify in its proper and legal sense every thing that may be holden, provided it be of a permanent nature, whether it be of a substantial and sensible, or an unsubstantial, ideal kind ;” and “ a franchise, (says he,) a right of common or other property of the like nature, are all of them, legally speaking, tenements.” 2 Black. Comm. 17. He classes franchises as incorporeal hereditaments, and treats of them as such, although, as Chancellor Kent has justly observed, there is some impropriety in that classification, as many franchises, especially corporate ones, have no inheritable quality. They are, however, otherwise subject to the same rules as other incorporeal hereditaments. As they are estates, so they are estates granted on condition. As Chief Justice Holt has expressed it, “ All franchises which are granted are upon condition, that they shall be duly executed according to the charter that settled the constitution : that being a condition annexed to the grant.” 1 Ld. Raymond R. 499. So too Judge Blackstone, referring to Coke as his authority, says, “ franchises, also are held to be granted on the condition of making a proper use of them. *2 Bl. Comm. 153 ; 9 Rep. 56. It should be especially observ- [ *585 ] ed that all these eminent authorities, and others who might be cited to the same effect, expressly speak of the tenure as on condition. None of them treat it as of the nature of a conditional limitation determining the estate ; as was urged in argument.
It necessarily follows then that the fixed and acknowledged' principles and rules of law that invariably govern and interpret other estates upon condition, whether corporeal or incorporeal, must apply here. Now it is well settled, that precedent conditions, which, must take place before the estate can vest, must be literally performed. Conditions subsequent operate upon estates already created and vested, render them liable to be defeated if broken. Those working forfeiture are not favoured in law and must be construed strictly ; nevertheles the grantee is bound to their substantial performance. “ The obligation between the government and the owner of such franchises as roads, bridges, and ferries, is mutual. He is obliged to provide. and. maintain facilities for accommodating the public at all times with prompt and convenient passage.. The law on the other hand provides him *585 with a recompense by means of an exclusive toll. An estate in such a franchise and an estate in land rests upon the same principle, being equally grants of a right or privilege for an adequate consideration. 8 Kent’s Com. 459. When then the estate in such a franchise has been legally vested by due and full performance of the precedent conditions (as in this case, by building the bridge according to the literal terms of the act) how stands the law as to the interpretation and application of the subsequent conditions ?
First, we shall find the general doctrine to be, that courts will lean against forfeiture, and will construe conditions going to defeat an estate in favor of the grantee so far as is compatible with the plain intent of the condition. Moreover a minute and literal compliance with the very letter of the condition is not required to support and preserve the estate as it is in respect to conditions precedent necessary for creating and vesting it. A [ *586 ] substantial performance according *to the intent of the grant will prevent a forfeiture. Thus as to conditions in deed, it is held by - the best authorities (which I cite as condensed by Comyns) that “ it is sufficient if the substance of the condition be performed.” 1 Roll. 426. “ So a condition that one deliver letters patent, and he delivers an exemplification of them; that he enfeoff, and he convey by lease and release ; that he give license to carry goods, and the party is disturbed by a stranger; that he withdraw his suit, and he discontinúe. 1 Roll. 427. This is enough.” Comyns’ Dig. Condition, G. 14. Again, in the same title L. 1, it is said of conditions subsequent generally, “ If the condition is performed in substance, it is sufficient. So if it be performed^ as near the intent' of the con-' dition as can be. So as well when the intention is to defeat as to create an estate.”
Then again in relation to “ conditions annexed by operation of law,” a similar reasonable latitude is given. One of those annexed to every estate in dower and curtesy is that the tenant do not waste, and by common law the estate was forfeited for breach of that annexed condition. Coke Lit. 233. But-if the waste be caused by tempest or the act of God, that is no breach. Neither does the tenant incur the penalty of waste when the amount is very small, or under the value of 40 pence. ' Coke Lit. 540. In a very recent decision of our own supreme court, this general doctrine is lucidly stated by the chief justice in delivering the opinion of the court, and is applied to corporate franchises. Speaking of corporate grants (and the rule applies with equal force to franchises granted to unincorporated individuals) he says.: “ There can be no great difficulty in ascertaining the principles that should govern conditions annexed to them. The analogous cases of individual conditional grants will give the rule. In these, a reasonable and substantial performance according to the intent of the grantor is required.” Shep. Touchstone, 133. 15 Wend. R. 291. In case of conditions subsequent, if impossible to be performed or rendered impossible by the act *586 of God, the grantee is excused and the estate is absolute. 2 Bacon’s Abr. tit. Condition. Shep. Touchstone, 133, 157. So if waste be committed *by a stranger, it shall not be a breach of the condi- [ *587 ] tion of the lease. 2 Bac. Abr. 652. The whole law on the subject will be found reasonable. The People v. The Kingston and Middletown Turnpike, ante,p. 193. Now in all these several cases of condition above mentioned, to give any effect to the rule of law, it must follow that no judgment can be rendered against the defendant upon verdict, unless that verdict shew to the court, at least generally and presumptively, the fact not merely of a breach of the letter of such subsequent condition, but of its intent and meaning ; or, in other words, that it was violated according to its legal construction so that judgment might be rendered “ according to the right of the matter,” as our statute phrases it. This would be shewn by a general verdict against the defendant, where the form of action and the pleadings are such that the general finding shows positively that the cause of forfeiture or right of re-entry had been directly proved. It may also be shewn by the special finding of such facts as the court adjudge to amount to a substantial breach of condition. But if the record present only the finding of particular facts which do not shew affirmatively any certain and substantial breach of condition, but merely a possible and contingent one, such as might or might not amount to legal cause of forfeiture, no matter whether the verdict be in form general or special, whether it submits the facts in technical form to the legal judgment of the court, or is simply responsive (as here) to the issue; I do not see how, consistently with the principles and authorities above stated, such a verdict can support any judgment against the defendants.
Judgment, is defined to be “ the conclusion of the law upon facts found or admitted by the parties.” Then, if there be neither admitted in the pleadings nor found in the verdict, either the general fact of “ unlawful holding,” nor any particular fact, from which such “ unlawful holding” against the state is a positive and necessary inference, how can the judgment of ouster be applied by the court as the conclusion of the law ? There are no facts presented on the record from which such a conclusion can be drawn.
Let us apply these conclusions to the case before us. *Here [ *588 ] the verdict is in form for the people. It is not a general finding of “ guilty of unlawful holding,” in the words of the statute, but it finds a number of facts put in issue, in favor of the defendants, and one only against them. It finds that the opening of the bridge is not now and has not leen for some years, of the required breadth of twenty-five feet. On every other point the conditions of the grant, whether express or implied, precedent or subsequent, are found to have been duly performed. We cannot learn from this verdict, even when collated and compared with the information and *588 pleadings, whether the misuser was in kind, or amount, any way material to the object of the bridge and its draw, or whether there resulted or was likely to result any private or public injury or inconvenience whatever. Neither can we ascertain, even by inference, whether the conditions annexed and implied by the legislative grant were “ not executed in substance,” according to the reasonable and just rule of law, although there might have been a departure from the letter of the grant. The diminution in question, for all that appears to us, might be accidental. It might be so insignificant as never to cause the slightest inconvenience.
The chief justice considers it a sufficient answer to this difficulty that “ the defendants held the affirmative and were bound to maintain their title generally to the franchise. They must therefore show the width between the arches to be according to the requisition of the statute, or a legal excuse for any departure.” He moreover adds, that “ if there was a legal excuse, the verdict for the people negatives its existence.” This language strikes me as in direct contradiction to the whole law of conditions. As to the precedent conditions of building the bridge, the defendants indeed hold the affirmative, and must maintain their title to the franchises by shewing performance of those conditions. They have done so. But the right and estate having thus been shewn to be vested, it is now for the other party to show affirmatively how their right of re-entry or of ouster of the present holder from the estate or franchise, has accrued. If the doctrine stated by the [ *589 ] chief justice is carried out to the full *extent of its legitimate consequences, every mon ied institution might be held, upon a vague suggestion of an unlawful holding, to prove affirmatively minute compliance with the requisitions of every law touching them, as well as with those of their respective charters, and this for matters never made the express condition of their grant, nor in the slightest degree essential to the honest and fair performance of their duties. Thus, every bank andinsurance company might be compelled, under penalty of forfeiture, and without any specific charge of abuse, to prove affirmatively their having made the annual report required by law precisely on the first Monday in January, in every year since their foundation, and in the very terms prescribed by the law, or else some legal excuse for not doing it on that day. They might be held to maintain their title by proving affirmatively the carrying on business in all respects precisely according to the requisitions of their charters, although no charge of any actual violation of those requisitions be attempted to be proved or even positively made. A hundred instances might be given where the evidence of such literal compliance with minor and purely directory requisitions of law, through a course of years, would be wholly out of the reach of rail road companies, canal or turnpike corporations, or literary institutions, as well as of mere moneyed corporations. The establishment of this rule would make all corporate rights, as well as all private franchises, to be held subject not to the *589 discretion of the legislature to repeal or amend the respective charters, but to the mere good pleasure of the attorney general.
On the contrary, I conceive that the defendants must always, (as is conceded they have done in this case,) shew affirmatively the law and right under which they hold, and the performance to the letter, of the conditions precedent upon which the estate or trust was vested. They have then shewn' a satisfactory prima facie title to its enjoyment.
Whatever conditions they have assumed to perform, no matter how severe, they are bound to execute them. But when the presumption of legal possession is with the holder, as it always is when once vested, until otherwise judicially *ascertained and declared, see 6 [ *590 ] Cowen, 26, 9 Cranch, 51, 6 Barn. & Cress. 733, the cause of forfeiture should be affirmatively charged and assigned, and that is the true issue that must be presented to the jury.
The information is in nature and form of a criminal proceeding, (as indeed it is expressly considered by Ch. Justice Spencer, 15 Johns. R. 388 ;) and the statute prescribes that parties in default must be found or adjudged guilty, before judgment of ouster. If they are to be found or adjudged guilty, they must be proved so, and the finding must, as in other criminal proceedings, be positive, and not a mere technical inference. It is never put upon the accused at trial to prove his obedience to every jot and tittle of the law he is arraigned as having violated. It is enough if h'e denies and repels the charges of the indictment when they are sustained by prima facie proof. This I hold to be the reason, the equity, the public policy and the general legal principles of the whole question.
Upon these grounds, I was content to leave the subject in the opinion delivered by me last year in this case, and which was sustained by a majority of the members who then composed this court. But the great importance of the question, and the respect due to the high judicial officers who have taken a different view of the subject, have induced me, in reviewing the question after rehearing the argument, to- examine more thoroughly than I had done the positive authorities bearing on the matter, and I have found the clear principles just stated to be supported by the strongest authority of precedents, decisions and practice, Such authority may be found, as I have already intimated, in the close analogy of the law of other forms of public prosecution for remedying abuses of franchises, as by indictment. There is a very recent English case, a good deal resembling this in its facts, though they were differently presented for judicial decision, The King v. Tindal, 6 Adolph. & Ell. which was decided after very elaborate argument, about the same time this case was, in our supreme court. It was an indictment charging the defendants with having obstructed the har- , bor of Scarborough, and rendered it insecure. A *special ver-, [ *591 ] diet found certain fapts as to planking the piers, “ by which *591 works the harbor was rendered’less secure.” The-court hesitated long whether the verdict was not so imperfect as to render it necessary to award a new trial, but finally gave judgment for the defendant. Chief Justice Denman, in pronouncing the opinion of the court, after noticing the Vagueness and uncertainty of the verdict, and the long doubt of the court whether it was sufficient to support any judgment whatever, added: “ Without deciding at all how far the conduct - of the 'defendants could be justified, we think that the jury must be taken to inquire whether such consequences must amount to a iiuis'ance. We do not think that they must, but on the contrary, hold that no person can be made criminally responsible for consequences so slight, uncertain Und remote.” Although this be a different mode of proceeding, and a different form of verdict, yet the same reasons of good sense and justice must apply here, unless the rights of 'private citizens as against-the government are held less sacred 'before our republican tribunals than ’they now "are in the court of queén’s 'bench. On the same principle, how can we hold the defendants responsible, even to the loss of their franchises, for consequences of the "diminished width of their draw, which, so far as the verdict or record show us, are wholly constructive, uncertain and conjectural.
Rut we need not resort for authority to merely analogous cases where, though the‘principle be the same, it may be'alleged to be modified by the nature or subject of the action and the form of the verdict. The strongest authority will be found in the precedents • and decisions on informations in quo w'arranto, -ancient and modern. These have been repeatedly settled by the best legal talent of the times, and, after great cbnsideration, 'proportionate to'the magnitude of the interests involved, have'received 'judicial'Sanction,; and'have been subsequently recognized as of conclusive authority.
First of all I refer to the great historical case of the 'proceedings against 'the city of London in 1682, for forfeiture of its charter. This [ *592 ] cáse is'the Stronger for the "-purposes *to which I cite it because it has- come down to us blackened and-branded with the deserved odium of háving pushed the doctrine of forfeiture and the prerogative process of qw warranto‘not only to'the extreme limits, buteven beyond the bounds of justice. It thus marks-the'ultimate bounds of this'action-; every step beyond must'be'bold innovation.
At affiine when the' power of the crown seemed almost irresistible, the city of London, -by means of its chartered privileges, still presented a rallying point for the friends of constitutional-freedom to "oppose the encroachments of a corrupt and dissolute monarch, plotting-against the liberties of his people. Whilst the rest of the'kingdom had yielded, the city still held out, (to use the image of Charles Fox in his beautiful fragment of the history-of those times,) "like a strong fortress in a conquered country.” To abolish those franchises)'so odious to the crown, and’to do this,’under - color -of law,-the *592 ministry called to their aid the best legal talent that was either venal or servile enough for such uses. To the honor of the profession it must be added that much of the highest legal talent of that day passed through those years of trial and peril without any taint of either reproach. The prosecution was conducted with eminent ability by Sir Robert Sawyer, then attorney-general, but the information and ’pleadings, as we learn from cotemporary writers, (Bishop Burnett and R. North) were prepared by a still more skilful hand. They were drawn by Saunders, soon after chief justice of England, the most learned and acute special pleader of a very acute and learned bar — a man whose professional knowledge and talent, have, in spite of gross vices and unblushing political subserviency, still retained for his name a high authority and distinguished rank in his country’s jurisprudence.
The defence of the city was managed by Treby and Pollexfen, both of them afterwards chief justices, whose names have still great weight in the law.
In these proceedings every point was strained in favor of the crown, appearing by the attorney-general, as far as a court previously organized for such a purpose would permit *with any show of ad- [ *593 ] herence to the rules of -law. They thus afford us a precedent marking the extreme boundaries to which proceedings in the nature of a quo warranto can be carried as against the holders of franchises. But they were conducted by learned lawyers and before judges who had professional reputation at stake. Accordingly Blackstone tells us that “ though they gave great and just offence, yet in strictness of law the proceedings were sufficiently regular.” 1 Bl. Comm. 484. They have therefore served as the leading precedents in England in more modern proceedings, some of which have been judicially sanctioned, as in Rex v. Amery, 2 T. R. 515. In this memorable prosecution the information was general, (as it is here) charging usurpation of the franchises and requiring the city to show by what warrant they claim to use, exercise and enjoy the liberties, franchises, &c. “ Quo warranto clamant habere, uti'eP gaudere libertates etfranchisa prcedieta.” I cite from the record- as set forth in full in Howell’s edition of the State Trials, vol. 8. The city there pleads, sets forth its charter and its historical evidence of franchise, and alleges that they still use the privileges. The attorney general replies by assigning several special causes of forfeiture, affirmatively setting forth alleged instances of breaches of condition and offences “ whereby they, the mayor and commonalty have forfeited their franchises or, in the law latin of the day, “ per quod idem mayor et oommunitas prcedictas libertates et privilegia foris fecenmt.” It was upon this assignment of cause of forfeiture that judgment was rendered against .the city after demurrer and argument. 8 Howell’s State Trials, 1050, 1309. Although the judgment was reversed by act of parliament, the authority of the mode of information and pleadings remains unshaken, and is thus recognized by *593 Judge Blackstone. Speaking of the forfeiture of corporate franchises for neglect or abuse, he says, “ The regular course now is to enquire by what warrant they now exercise the power, having forfeited it by such and such proceedings and then as an example of the manner of doing this he refers to these proceedings against the city of London “ as in [ *594 ] strictness of law sufficiently *regular.” It is clear at any rate, that if they were irregular, the irregularity would not have been in favor of the defendants. The same form and rule of proceeding will b e found in much later English cases, as in Rex v. Amery, 2 T. R. 515, upwards of a century after. I have found no single English case or precedent authorizing any deviation from the rule of the public prosecution setting forth the causes of forfeiture, but many supporting it. I content myself with referring in addition, to Rex v. Ponsonby, 1 Ld. Kenyon’s cases, 1, because the legal eminence of Chief Justice Kenyon adds much authority to that of the case which he had preserved in full notes for his own professional use, and not as a mere reporter.
But without dwelling further upon English cases, I come down to our own times and country. In 1825, the fraudulent or imprudent conduct of several monied corporations in this state, led to a number of quo warranto in-formations against the banks of Niagara, Hudson* Washington and Warren, and others.' All these informations went on the ground of forfeiture by abuse and breach of subsequent conditions or duties. The proceedings and pleadings were prepared by the then attorney general, the late Samuel A. Talcott, who will long be remembered as one of the most remarkable examples of a purely and eminently legal mind that our country has yet produced. Those proceedings will be found set forth in substance in the case of the Bank of Niagara, 6 Cowen, 197. The information, like that in the English cases, sets forth that the defendants used and still do use, without warrant, certain liberties, &c. and calls upon them to shew by what warrant they claim so to use and enjoy. To this, the bank shews its right by charter affirmatively. The attorney general then replies, assigning special causes of forfeiture, as suspending payment, &e. Throughout the whole elaborate argugument between Mr. Talcott and one of the most able, certainly the most learned of his predecessors in office, Mr. Van Vechten, it is maintained and conceded “ that a forfeiture is not to be presumed, but must be substantially stated.” The supreme court decided against the sufficiency of the [ *595 ] assigned cause of forfeiture, *but the correctness of the pleadings was affirmed by them. “ The court, by Savage, chief justice. The first question respects the sufficiency of the information. Upon this I shall only remark that the form adopted here is the same used in the celebrated case of the City of London, which was adjudged sufficient. A like precedent is given in Rex v. Amery, 2 T. R. 515. I am, therefore, perfectly satisfied with the pleadings.” Again, in The People v. Manhattan *595 Company, 9 Wendell, 351, the same course was pursued, the attorney general in his replication assigning special.causes of forfeiture,-as “ the not furnishing a sufficient supply of pure and wholesome water,” &c. Yet the court held the public prosecutor to very strict compliance with the rule. They said (in the opinion of the court by Judge Sutherland) that “ great strictness was required in assigning a breach of condition for producing forfeiture ; that it must always be stated according to its full legal effect and spirit,” and they unanimously held the assignment of forfeiture on the ground of not supplying water, to be bad, because “ it was defective in averring the particulars necessary to show a legal breach,” though it was distinctly charged in general terms. 9 Wendell, 376.
Such, then, according to precedent, authority, analogy of other branches of the law, as well civil as criminal, and above all, the reason, principle, justice and public policy of the matter, should have been the course of proceeding here. After compelling the defendants to show affirmatively by what title they claim, and how they came into possession, if the attorney general relied upon any subsequent forfeiture, it was his duty to set it forth, and charge the ground or cause of it, or the breach of condition, whereby they forfeited their privileges, and consequently held unlawfully. Nor can a more just and reasonable course of proceeding be possibly devised for such purposes. It alike guards public rights against intrusion and abuse, and gives adequate protection to the unoffending holder of legislative grants. If an individual intrudes into the possession and use of a navigable stream or its water privileges, or into any other public property subject to the general uses of all citizens — if *an illegal association claim [ *596 ] to act as a chartered company — if a company chartered with specific powers, as of ordinary banking or insurance, usurp the right of issuing post notes, or dealing in stocks, or any other power not granted — in such cases the attorney general, upon his own motion, or on relation of those aggrieved, can call upon the offenders to show affirmatively by what warrant they claim to act. The burden of proof and the presumption of usurpation is upon them ; for if innocent, their defence is in their own hands.
But if a bank, or an insurance or rail road company has been duly chartered, its capital honestly paid up and invested in the objects prescribed by law — or if the owners of a bridge or ferry have been in lawful and peaceful possession under a state grant, it is neither just nor reasonable nor according to legal usage, that any of these should be compelled, under pain of forfeiture, upon a general suggestion of unlawful holding, to set forth and prove compliance with every requisition of their charters for years, whether great or small, important or unessential, material to the public interest and accommodation or wholly immaterial, and tc negative every deviation, whether intentional or arising from the carelessness of an officer or the malice of a stranger; or if they cannot make out all this, then to show some legal ex *596 cuse. On the contrary, the law, as it has hitherto been understood and exercised, makes no such unreasonable claims, It effectually provides against abuse or neglect in the exercise of franchises, by investing the law officer of the state with the power of charging specifically any abuse, which he or those aggrieved may deem sufficient reason for abrogating the misused grant, and he can compel the offenders to refute, or explain or excuse those charges, or be ousted from their franchises.
In the present case, Attorney General Beardsley, in his information, charged generally the defendants with “ having usurped, intruded into, and unlawfully held and exercised” “ certain privileges,” and he calls upon them to show “ by what warrant or authority they claim to use and ex- [ *597 ] ercise the privileges aforesaid.” To this demand the *defendants reply fully in their plea, which sets forth the act of grant, and obedience to all the requisitions necessary to give them “ warrant and authority” to enter upon and exercise those rights. On every point necessary for establishing such preliminary right, the jury have on the issue presented found for the defendants. They have also set forth that they have eontiwur ed to comply with the conditions, and amongst these that the draw of the bridge was and has continued to be of a certain width. This I consider as being merely the formal exclusion of any concession of nonuser or of subsequent breach, to be met not by a joining issue but by a special assignment of breach. If it amounts to more than that, it was mere surplusage, for it sets forth what the information did not and cannot call upon the defendants to show. They are required to show by what warrant they claim and use the franchise, not whether or not they have forfeited it. As Judge Story states the rule : “ Whenever the whole allegation can be stricken out, without affecting the legal right set up by the party, it is impertinent and may be rejected as surplusage.” U. S. v. Burnham, 1 Mason R., 66. But the then attorney general, instead of proceeding to charge and assign cause of forfeiture, if that was relied on, joins issue on all the facts set forth, material and immaterial; the real general issue, in effect, in this stage of the proceedings being “ whether the defendants claim and use the franchises without lawful grant, warrant or charter,” and the facts being material or impertinent as they bear upon the point or not. He consequently joined issue on an immaterial fact, and the result is an uncertain and imperfect verdict. The issue is indeed such, as though immaterial in its actual result, yet if found with the other facts (as those were found) for the defendants, would have been conclusive. As it is, it is uncertain and void. It so far resembles an often cited case, where on a bond conditioned to pay a sum on or before the 5th of December, the defendant pleaded payment on the 5th, and issue was joined on that fact. The verdict was for the plaintiff, showing that the defendant had not paid on the 5th Dec. Yet as he might have paid before that day, this was held to be an immaterial issue, though if pay- *598 meat on that day had been found, it would have been conclusive *for the defendant. 2 Str. R. 996. According to repeated and [ *598 ] unshaken decisions from early times, and often recognized in our courts, “ an immaterial issue is when, upon verdict, the court cannot know how to give judgment, whether for plaintiff or defendant.” 1 Levintz R., 22. 'The present verdict presents just such a case. The court here cannot, except upon mere presumption or doubtful inference, know how to give judgment upon a verdict finding a fact, which may or may not according to other unknown circumstances, amount to good cause of forfeiture, but which does not at all affect the original warrant or authority “ whereby the defendants claim to use and hold” their franchise. That it is not a finding of any fact proving unlawful holding or “ whereby the defendants forfeited the franchises,” so as to authorize the court to pronounce judgment of ouster, is very clear to my mind, especially under an information containing no averment of any forfeiture having been incurred.
The only doubt then that I have remaining as to the disposition of this cause is to the remedy and precise judgment to be rendered. There was a substantial and material issue upon the several facts, shewing the right under which the defendants claim, and all these are found for the defendants. Thus the presumptive title to the franchise is established, which is good until cause of forfeiture is assigned and found. The fact found against the defendants is in itself immaterial to their original title, and may, therefore, consistently with usage and authority, be rejected as superfluous. Under this view of the case judgment should be simply rendered for the defendants. Nor would any public injury result, supposing the diminution to be substantial, for the attorney general can file a new information and establish the forfeiture of the franchise according to law; that being a point never passed upon.
But on further reflection I have come to the conclusion that the law affords another and more appropriate remedy. In similar cases in civil actions, and even in this form of public prosecution, the legal remedy is a judgment of repleader, Croke El. 883, Comyn’s Dig. Pleader, R. 18, or *else, what is nearly the same in character and effect, [ *599 ] a new trial with leave to amend the pleadings, as in Rex v. Phillips, 1 Burr. R. 292. The whole law on this head, its learning and its reasons, are clearly stated in that case. Lord Mansfield says, “ What is the rule of law as to an immaterial issue joined and verdict found upon it ? It is that when the verdict found upon it does not determine the right, the court ought to award a repleader, unless it appear from the whole record that no manner of pleading the matter could -avail.” In that case, resembling the present in one immaterial fact being presented together with many material ones, and the issue being upon all, the principle of repleader was acknowledged and applied, though from peculiar circumstances it was *599 thought expedient not to do so in that precise technical form, but by setting aside the verdict and giving leave to amend the pleadings “ in the nature of a repleader,” as Lord Mansfield called it in a subsequent case on the same subject. Rex v. Phillips, 2 Burr. R. 757. In this case the exception of Lord Mansfield does not apply. Better pleading would avail. The plea may be amended by striking out that which is surplusage, i. e. all except that which shews how the defendants acquired title. The attorney general may then, if he judges the facts to warrant it, assign his forfeiture? and the verdict will be upon some precise issue “ determining the right.” The judgment of repleader is general, say the books. It is “ that the parties replead, and they must begin again at the first fault which occasioned the immaterial issue.” 1 Ld. Raym. R. 169. 2 Williams’ Saunders, 319. The effect of setting aside the verdict and amending would be the same and may be preferable, if it avoids any technical difficulties, as it did in the cases reported in Burrows.
The case of Gomez v. Garr, in our court, 9 Wend. R. 650, affords an example of the application of the same rule to an analogous civil case. There general damages had been assessed on several counts together, one of which was adjudged to be bad, so that “ acting as they must from what appeared on the record, the court, (as the chancellor said,) [ *600 ] found it impossible to sustain a judgment founded upon that *general verdict.” There a new trial was awarded, and the plaintiff in error had leave to apply to the supreme court for permission to amend his plea. The same principle has been applied to special verdicts, which the present one much resembles jn effect, though it is not so in form ; for it finds not one issue, but numerous facts, and these are referred, not by the jury in words, but yet in effect' to the court, for the conclusion of law. The decision of the supreme court of the United States pronounced by Chief Justice Marshall, in 11 Wheaton, 415, and that of our own court upon an opinion of Chancellor Jones, in 8 Cower's R. 600, establish the principle that upon an uncertain or imperfect verdict, to be made out by reference and not in itself conclusive as to the essential facts, the court will not pronounce judgment. The difference between such a verdict when special and when general, (both equally finding an immaterial or uncertain issue,) is only in the remedy; the one being remedied by a new trial alone, the other commonly requiring a previous amendment of the pleadings by repleader or otherwise
It was strongly urged in argument that, after verdict, it must bo presumed that the diminution was sufficient cause of forfeiture, because the judge at the trial would otherwise have charged the jury to disregard any unessential transgression of the letter of the grant. The chief justice also thinks that “ we must assume that the defendants have had the full benefit of any explanation or exeuse in their power to offer within the issue ; and if such afforded a justification in judgment of law, the verdict would have been *600 for them.” Not so. The law expressly negatives such a presumption. It is held that nothing is to be presumed after verdict but what is expressly stated in the declaration, or what must be necessarily inferred from the facts there stated. Such is the rule laid down by Mansfield, 1 T. R. 48, and the converse is re-affirmed by J. Buller, in 8 id. 26. “ After verdict, every thing shall be intended which the allegation of the record required to be proved, and no more.” Such also is the doctrine of our own courts. No allegation of a material breach or sufficient cause of forfeiture is set forth in the record ; there is, therefore, nothing to be intended or presumed *to that effect. All assumption or presump- [ *601 ] tion of proof or explanation must be excluded. We must confine ourselves judicially to the record. I am therefore of opinion that the judgment of the supreme court should be reversed, the verdict set aside, and a repleader directed; or if the court think it more appropriate, an amendment of pleading directed or permitted in the nature of a repleader.
It may be that the judgment of the supreme court, as itnow stands, may work no injustice in this particular case, or that it may even prove locally beneficial. The opinion of the court does not assert the naked claim of prerogative, and I am confident that the learned judges have no wish to extend official power at the expense of private rights. But the decision is unfortunately such as to make it a precedent for other eases, that may shake the security of legislative contracts and corporate and private franchises. The result would be, I fear, to create serious impediments to useful enfcerprize and beneficial investment of capital for public purposes hereafter, added to great injury and injustice towards rights already acquired. Its effect is to overturn the ancient limits of practice in this mode of information, salutary and wise in the main, and to substitute a more vague and indefinite power .over franchises, to be confided to the unchecked discretion of the law officers of the state. It is a power that might be safe in honorable hands, such as have hitherto held those trusts. Yet it is also a power that would have been coveted by Jefferies or Saunders, although they did not venture to claim it even in the worst days of regal prerogative. It is a power which men like Jefferies or Saunders, such as may sometimes be found even in republics, would be irresistably tempted to abuse. For my own part, I hold it to be far wiser and safer to adhere strictly to the old practice sanctioned and improved by the experience of two centuries, during which period its very abuses have contributed to its correction and improvement.
This very case affords us a fair test of the superior wisdom and justice of the ancient rule over that now asserted — of its equal efficiency in guarding the public interest, and of its far greater equity towards private franchises acquired *on the faith of the state. Of the substan- [ *602 ] tial facts and real merit of this controversy, we know nothing judicially beyond the record j for inyself, personally, I can add that I have no *602 other knowledge, official or unofficial. The diminution of the width of the draw may perhaps be a very serious abuse, or a negligence working much public injury. It may likewise be a matter of no consequence whatever, such as no jury could upon a distinct issue to that effect find to be a breach of any condition, an abuse or perversion of any trust, or an injury to any individual. Suppose the latter case. Sustain the decision of the supreme court, and you will have then committed a serious injustice towards the owners of the bridge. You will have deprived them of a valuable franchise, for which they have paid a large consideration ; and this is done solely upon a mere arbitrary and technical rule of pleading and presumption. On the other supposition : apply the rule I have asserted to be that which has always governed this form of proceeding, and what is the result ? Upon a repleader and a distinct assignment of some alleged cause of forfeiture, the question will be clearly presented to the court and jury. If the diminution be immaterial, it will then be made so to appear on the record. If it he otherwise, then the unlawful holding after forfeiture of the franchise will be distinctly found, the defendants will be justly deprived of their misused privilege, and the public will be relieved from the consequences of their misconduct.
III. It may be necessary to add a word or two of remark upon “the judgment to be rendered by this court in case of reversal. The simpler and more direct mode of reaching the end I have in view, is by judgment of re-pleader, and this is in conformity with the ancient practice. The judgment is simply that the “ parties replead,” beginning at the first error. This in fact and substance was committed by the attorney general in taking issue on an immaterial fact ; though in form it might seem to be by 'the defendants in setting forth as the ground of their title on which they claim the franchise, facts which could go only to refute the charge of forfeiture when that was made. Their error, however, was of surplusage. His, was material to the re- [ *608 ] suit. *There are some technical objections to the judgment in this case, which it is proper to 'State, though I regard them as of little weight, if they contravene the n'ecesities of justice. On looking into the books of practice, I was surpised to'find it stated that a repleadér cannot be awarded on a writ of error. This is certainly the present English practice ; but on ex-mination I can find no possible reason for it that can apply to this cóurt, and indeed scarcely any'reason at 'all. It rests mainly upon the authority of a case in Salkeld, 2 Salk. R. 569, and a dictum in Saunders’ Reports, and the notes of his learned commentator. 2 Williams’ Saund. I presume that it depends upon English usage, and'the jurisdiction of the courts in error, which is confined to comparatively a few forms of judgment, ast“ to reverse, to recall, to grant venir-e de novo,”ikc. Our court has received from the'statute much larger powers. “ The court for the correction of errors shall examine all errors that'shall be 'assigned ÍP any record brought-from the supreme court *603 or in any process or proceeding touching the same, and shall have power to reverse or affirm the judgment of the supreme court, or to give such other judgment as the law may require.” 2 It. S. 96. As this statute is intended to carry out the constitutional provision erecting this appellate tribunal, I cannot doubt that we should give to it the largest and most beneficial construction consistent with the words employed; and if a judgment of repleader is necessary to effect the ends of justice and public polióy, then that is the judgment the law here requires, in spite of the dicta in Salkeld and Saunders, which refer only to the ordinary usage of their own forms and courts. “ General rules,” says Mansfield, in the case above cited, “ are wisely established for attaining justice with ease, certainty and despatch. But the great end of them being to do justice, the court must see that it is really attained.” If, however, we are to look merely to old authority on this question, then we may go back to the oldest, for judge Story informs us, that before the decision above mentioned, “ it is certain that the ancient practice was to grant repleaders on ivrits of error.” 1 Mason R. 69. And thus I find the old law to be *laid down by Chief Justice Hale, who says : [604 ] " In ancient times it was usual to award a repleader on a writ of error in K. B. and that he had perused ancient rolls (nine of which he refers to) in which a repleader is awarded, but it is not in use at this day.” Bennett v. Holbeck, 2 Saund. R. 319.
Another objection may be that alleged rule, that repleader cannot be granted infavor of the party who made the first error, which may perhaps be hard to the defendants. This too, is one of those rules of practice and form, which being made for attaining justice, should have little weight when they prevent courts from doing justice. It, however, rests on doubtful authority, and in the case in 2 Strange, 994, above cited, and frequently referred to in modern decisions as good law, a repleader was awarded in favor of the defendant, whose plea had led to an immaterial issue and an uncertain verdict. Besides, if the first error -here be one of the defendants, it is one of form and surplusage; the material error was on the other side. But if for these or other reasons, there be any hesitation as to applying that form of judgment, it may be more expedient, as it will equally conduce to the ends of justice, to adopt that modification-of the judgment of repleader first introduced in the case of Rex v. Philips, and sanctioned by the authority of our own court in Gomez v. Garr, 9 Wendell, 668, and Addington v. Allen, 11 id. 374. Upon reversal of the judgment, a venire de novo is awarded, and leave is given to apply for permission to amend ; which the court below regard as a direction to that effect. Upon amendment of the plea, the replication may also be amended, or in the election of the attorney general a new one put in, of course, 2 Burr. 757, and the cause of forfeiture may be rightly assigned, if it be that, and not an original usurpation or intrusion which is relied upon to oust the defendants from the franchises now held.
*604 I am of opinion that the judgment of the supreme court should be reversed, and if a majority of the members of the court shall concur with me, then such rule may he entered^ as shall be thought proper.
[ *605 ] *On the question being put, Shall this judgment be reversed ? the members of the court divided as follows :
In the affirmative — Senators Hawkins, Hopkins, Hull, Humphrey, Hunt, Livingston, Maynard, Nicholas, Peck, Tallmadge, Yerplank —11.
In the negative — The President of the Senate, The Chancellor, and Senators Clark, Edavards, Ely, Furman, Hunter, Root, Wager, Works — 10.
Thereupon a rule was entered in these words: Counsel for the respective parties having been heard and due deliberation having been had, It is ordered and adjudged, that the judgment of the supreme court be and the same is hereby reversed ; and it appearing to the court that the plea of the plaintiffs in error in the court below, and the issue thereupon joined, Avhich has been found for the plaintiffs in the court below, does not determine the right, and that no judgment therefore should be given upon the verdict aforesaid, it is further ordered and adjudged, that the said parties do re-plead, that is to say, that the plaintiffs in error do answer anew to -the information filed in this cause in regard to the said issue, and that the parties do further prpceed, until an issue or issues of law or fact be duly joined.*

The Chancellor delivered an opinion in writing for an affirmance of the judgment of the supreme court; but the reporter not having received it from the chancellor, is not enabled to lay it before the profession.